FRED H. BRUNS, JR., APPELLEE, v. CITY OF SEWARD, NEBRASKA, A MUNICIPAL CORPORATION, ET AL., APPELLANTS.
185 N. W. 2d 853

Filed April 9, 1971. No. 37698.

Russell A. Souchek, for appellants.

Byron J. Norval, for appellee.

Heard before WHITE, C. J., CARTER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

Plaintiff, a taxpayer, attacked a resolution by which the city council of the City of Seward had undertaken to establish an airport authority. Seeking injunctive relief, he alleged that the city had not satisfied a statutory condition. The statute has required a city to own or

operate an airport before it can create an airport authority. The district court found for plaintiff, declaring the airport authority nonexistent and ordering a permanent injunction. Defendants city, councilmen, clerk, and members of the airport authority appeal.

An airport was built in 1966 by Charles H. Krutz. Having cleared and sodded the strip, he registered it with the Nebraska Department of Aeronautics. He last renewed his registration on February 3, 1969, when in his application he designated the land a personal use airport not open to the public except by prior arrangement. The department designated the airport with the symbol "P" on its aeronautical chart. The symbol represented a personal use airport with emergency facilities only, and an airport that was "Not for public use—possible unreported hazards—user assumes all risk."

Personal use airports were permitted without certificate by the department's practice, and no certificate was issued to Krutz. According to testimony of a department representative no minimum standard existed for a personal use airport. The principal purpose of annual registration requirements was analysis of aviation activity within the state. See Report of the Department of Aeronautics to the Governor (1969).

On April 1, 1969, Seward leased the airport from the Krutzes and also other land from other parties in connection with the airport. The term of each lease was 1 year subject to earlier termination on 30 days notification by either party. The consideration was $1. On April 15, the city council resolved to create an airport authority. On May 6, the city assigned the leases to the authority.

On June 6, 1969, the airport authority applied to the Department of Aeronautics for a municipal license. The application was denied. The land fell far short of satisfying requirements for a municipal airport. According to a department representative, the airport authority was "granted a license for a personal use airport" on June 10.

The department approved a state grant in aid of the authority, and an application for federal aid was pending. Running through the statutes are declarations of public purpose, public need, and federal aid relating to airports. See, §§ 3-102, 3-104, 3-123, 3-147, 3-206, 3-216, 3-218, 3-237, 3-239, 3-504 (14), 18-1506, and 18-1507, R. R. S. 1943.

The Department of Aeronautics Act provided: "(1) For the purpose of the laws of this state relating to aeronautics, the following words . . . shall have the meanings herein given, unless otherwise specifically defined, or unless another intention clearly appears, or the context otherwise requires. . . . (6) Airport means (a) any area of land or water, except a restricted landing area, which is designed for the landing and takeoff of aircraft, . . .. (8) Restricted area means any area of land, water, or both, which is used or is made available for the landing and takeoff of aircraft, the use of which shall, except in case of emergency, be only as provided from time to time by the commission." § 3-101, R. R. S. 1943.

The Cities Airport Authorities Act which was the ground of the council resolution provided: "Any city now or hereafter owning or operating an airport is hereby authorized to create an airport authority . . .." § 3-502, R. R. S. 1943. The Revised Airports Act required the licensing of airports and restricted landing areas, except "restricted landing areas designed for personal use." §§ 3-133 and 3-136, R. R. S. 1943.

The Revised Airports Act authorized a bond issue only with electoral approval; yet it provided for taxation to raise money to acquire, construct, and enlarge airports. See, §§ 3-211, 3-213, 17-507, and 18-1502, R. R. S. 1943.

The Cities Airport Authorities Act limited the tax levy to 2 mills, but it empowered an airport authority to incur debt, issue negotiable bonds, and provide for the rights of bondholders. § 3-504 (12) and (15), R. R.

S. 1943. Electoral approval was unnecessary. See, §§ 3-504.01, 3-507 (2), and 3-513, R. R. S. 1943.

The question is close. The powers conferred by the Cities Airport Authorities Act were greater than were the powers conferred by the Revised Airports Act. The different provisions for issuance of bonds are important. We conclude that the word "airport" in the clause "Any city . . . owning or operating an airport" in section 3-502, R. R. S. 1943, means an airport qualified and licensed for public use. Cf. Title 49 U. S. C., § 1101 (8), as amended by Sept. 20, 1961, Pub. L. 87-255, § 8 (a), 75 Stat. 526, now Title 49 U. S. C., § 1711 (12) (1970). The Seward airport did not fall within that definition.

The judgment is affirmed.

AFFIRMED.

SPENCER, J., participating on briefs.

WHITE, C. J., dissenting.

I must respectfully but strongly dissent. The majority opinion finds that the word "airport" in section 3-502, R. R. S. 1943, can mean only an airport authority licensed for public use. In so doing the majority opinion prohibits the lawful attempts of the City of Seward to operate under the Cities Airport Authorities Act, sections 3-501 to 3-514, R. R. S. 1943, to develop a safe and approved airport for the city.

The majority opinion thwarts the project of the City of Seward in the initial stages of its project for the singular reason that the airport being developed does not already meet the standards that the Cities Airport Authorities Act is designed to achieve. At best, this is an incongruous result. The lawfulness and appropriateness of the City of Seward's action is best demonstrated by a brief survey of the Cities Airport Authorities Act.

Section 3-502, R. R. S. 1943, authorizes the creation of a city airport authority at the discretion of the mayor and city council of the city.

Section 3-504(4), R. R. S. 1943, specifically gives a city airport authority the power: "To acquire, in the name

of the city, by purchase or condemnation, real property or rights or easements therein necessary or convenient for its corporate purposes, * * *."

The corporate purposes of the authorities are clearly defined in the same section at subsection (9): "To *design, construct,* maintain, operate, improve, and reconstruct so long as its corporate existence shall continue such *projects* as shall be necessary and convenient to the maintenance and *development* of aviation services to and for the city in which such authority is established, including landing fields, * * * and all facilities necessary or convenient in connection with any such project * * *." (Emphasis supplied.)

The word "project" as used in the act includes, "any airport operated by the authority, including all real and personal property, * * *." § 3-501 (6), R. R. S. 1943.

The word "real property" is "any and all things and rights usually included within the term real property, including not only fee simple absolute but also any and all lesser interests, such as * * * leases." § 3-501 (5), R. R. S. 1943.

Property acquired by the city may be conveyed or transferred to the city airport authority by resolution of the city council for use by the airport authority in connection with the project.

The city airport authority is given the power to tax the property of the city it services, to accept grants from the United States, the State of Nebraska, or any other agency, and incur debt and issue negotiable bonds. It may also expend all such funds for corporate purposes. § 3-504 (12), (14), (15), R. R. S. 1943.

The corporate purposes, as have been cited above, are the design, construction, improvement, or maintenance of an airport project.

The Legislature has clearly and thoroughly provided authorization for a city to acquire land and funds to develop an airport to service the city. The city airport authority is to have "full and exclusive jurisdiction and

control over all facilities owned or *thereafter acquired* by such city for the purpose of aviation operation, * * *." (Emphasis supplied.) § 3-502, R. R. S. 1943.

The language of the statute is explicit in referring to present and future land and facilities. The words "design" and "construct" do not envision existing entities but rather proposed facilities. As, if the language of the Cities Airport Authorities Act was not sufficiently clear, the Legislature included an even more definitive section. Furthermore, the section is relevant to the appellee's attempt to put the question of the airport authority to a vote of the electors of the city.

"Sections 3-501 to 3-514 shall be full authority for the creation of airport authorities by cities, and for the exercise of the powers therein granted to cities and to such authorities, and *no action, proceeding or election* shall be required *prior* to the creation of airport authorities hereunder or to authorize the exercise of any of the powers herein granted, any *provision of law or of any city charter to the contrary notwithstanding,* * * *." (Emphasis supplied.) § 3-504.01, R. R. S. 1943.

The conduct of the City of Seward through its city council during the period between acquisition of the lease from Charles Krutz and the application for a license to operate a public use and then a private use, personal landing area, is completely consistent with the spirit and letter of the Cities Airport Authorities Act. The council did not have to act in haste or deception in acquiring the lease of the Krutz' land or creating the airport authority by resolution. The denial of a license to operate a public use airport in no way jeopardizes the powers or authority of a city airport authority to *design* and construct a project airport under the auspices of the Cities Airport Authorities Act.

According to statute, council resolution is sufficient to create the airport authority; a lease interest in property is sufficient real property for the airport authority to manage; and, the corporate purposes of the air-

port authority thereby created include the design and construction of airport projects.

Furthermore, the federal definition of airport, on which the majority opinion relies, Title 49 U. S. C., § 1101(8), now § 1711(12), is part of an even more extensive program for the development of civil aviation in the United States. See, Title 49 U. S. C., §§ 1713(a), 1714 (a), 1716 (a), and 1716(b).

It is clear that the statutory scheme and spirit of the Nebraska Cities Airport Authorities Act is in response to the natural priority evidenced by Title 49 U. S. C., § 1701: "That the nation's airport and airway system is inadequate to meet current and projected growth in aviation."

The City of Seward was attempting to work within the statutory framework provided by the Nebraska Legislature for the acquisition of land and development of municipal airports. The city should not be forbidden to comply with the laws of Nebraska in order to bring public aviation facilities to Seward.

I would reverse the judgment and dismiss the cause so that the city airport authority may continue its project under the authority of the Cities Airport Authorities Act.

CARTER, J., joins in this dissent.